## Coney *against* Owen.

A sale for the payment of taxes of a tract of unseated donation land, during the life of the soldier, is void and confers no title upon the purchaser. But by virtue of the act of the 3d of April 1804, the purchaser, who has made improvements upon the land, cannot be dispossessed without compensation therefor.

ERROR to the common pleas of *Crawford* county.

David Coney and Calvin Mason against William D. Owen and Elias Thayer. This was an action of ejectment, for two hundred acres of land, in the seventh donation district, No. 1453.

The land in dispute was originally drawn by John Carlton, a soldier of the revolution, who, on the 11th of March 1829, conveyed the same to the plaintiffs.

The defendants claimed title, under a sale of the land for taxes, as unseated, in 1818; and offered evidence to prove the value of the improvements made upon the land since their purchase. This evidence was objected to by the plaintiffs, but the court overruled the objection, and sealed a bill of exceptions.

'The only material point in the cause was, whether the defendants were entitled to recover compensation from the plaintiffs, for the improvements made upon the land by them after their purchase at treasurer's sale.

The court below (Shippen, president) was of opinion, that the defendants were entitled to compensation, and so instructed the jury, who found a verdict for the plaintiffs, and valued the improvements at 1600 dollars.

The opinion of the court was assigned for error.

*Riddle* and *Pearson,* for plaintiffs in error, cited 1 *Smith's Laws* 489, *sect.* 7; 1 *Serg. & Rawle* 62; 3 *Watts* 106; 5 *Watts* 348.

*Dickenson,* contra, cited 4 *Serg. & Rawle* 62; 1 *Serg. & Rawle* 38.

The opinion of the Court was delivered by

GIBSON, C. J.—The argument built on the temporary exemption of donation lands from taxation, is that they are not within the jurisdiction of the fiscal officers, or the operation of those laws which authorize sales of unseated lands; and it would, perhaps, be conclusive were the jurisdiction bounded in respect to them as it is in respect to seated lands. But the words of the act of 1804, which is the groundwork of the succeeding legislation, distinctly embrace them while they are only excepted for a period by a par-

ticular statute.  "ALL *unseated* lands within this commonwealth," it is said in the second section, "held by individuals or bodies corporate, either by improvement, warrant, patent, or otherwise, shall, for the purpose of raising county rates and levies, be valued and assessed as other property." Words could not be more comprehensive.  General jurisdiction of all unseated lands being thus given, what is the effect of the act of 1782, which exempts donation lands during the ownership of the soldier?  Not to take away jurisdiction in the particular case, but to suspend the exercise of it. It is revived, not created, at the death or alienation of the soldier; it is general, and the suspension of it special: but that is not all. The exemption appertains to the person, and not to the thing; for it expires with the soldier or his ownership.  Having general jurisdiction, the doings of the officers, though voidable, are not void for ignorance or disregard of what is, at most, a personal privilege. Were the power as limited in respect to donation, as it is in respect to seated lands, the effect might be different; but its generality gives room for the common law principle, which requires a party to bring his privilege within the saving as an exception.  In Fox *v.* Wood, 1 *Rawle* 145, and Shoemaker *v.* Nesbit, 2 *Rawle* 201, it was held, that a court martial has jurisdiction of a military exempt so far as to conclude him by disallowing his privilege; a principle which, did the officers possess judicial power, would go far to make sales of unseated lands conclusive of the title.  They have but an executive power, however, to exonerate or abate; and hence it is, that the plaintiff would be entitled to recover, though the jurisdiction were conceded.  The latter being established, the question is ruled by Gilmore *v.* Thompson, 3 *Watts* 106, in which it was declared, that compensation is incident to every recovery for irregularity in the assessment, process, or sale; or for previous payment of the tax: in fine, that it was intended for every *bona fide* purchaser who has expended money or labour on the credit of the title.  Is not the defendant such a purchaser?  The plaintiff objects that he was bound to know that donation lands are exempt from taxation.  Was he bound to know that after a lapse, in this instance, of thirty-five years, the day of exemption had not gone by? In Gilmore *v.* Thompson, the purchaser might, with equal reason, have been required to know that the tax was paid.  In either case, the existence of an unsatisfied duty was a postulate equally indispensable to the legality of the sale, and the knowledge of it equally accessible to the bidders.  In the one, the land might not be open to assessment; in the other, not to sale; but in either, there might be the same want of *mala fides*.  The former may not be so distinctly within the letter of the provision, but it is as distinctly within the equity of it; and why should not the statute be liberally interpreted?  It is remedial, not penal; and nothing can be fairer than its object.  The owner ought not, for conscience' sake, to recover the uncompensated improvements of an occupant ignorant

[Coney v. Owen.]

of every title but his own. · For excessive compensation, the remedy is with the court; and, subject to its control, the presumption is that the jury will do justice.

KENNEDY, J.—By the seventh section of an act of the legislature, passed the 1st day of March 1780, *Smith's L.* 489, it is enacted, " that *all lands,* which have been, or may *hereafter* be granted within this state, to any officers or soldiers of the line of this state, by virtue of any resolution of congress, or law of this state, as a *reward* for *their services,* shall be, and are hereby *exempted from taxation,* for, and during the *life* of such officer or soldier respectively, *unless* the *same* shall be *transferred* to any other person." This enactment is again introduced into a subsequent act, passed on the 16th of March 1785; and in the very same terms, forms a provision of the 33d sect. 2 *Smith's L.* 287. After the passage of these acts, the land in question was granted under the directions of an act passed on the 24th of March 1785, by the commonwealth to John Carleton, as a *reward* for his services, performed as a soldier of the Pennsylvania line, to be held by him during his life or ownership thereof, according to the express enactment and provision of the above act, free and exempt from all liability to taxation.

In accordance with this view, and upon this ground the decision of this court, would seem to have been made in Finney *v.* The Commissioners of Mercer county, 1 *Serg & Rawle* 62, where it was held, that land granted by this state to an officer of the Pennsylvania line, is not subject, while owned by him, to county or road taxes; nor in short, to taxes of any kind, it may be added, according to the principle of that decision. This *exemption* of the *land* from taxation has, very properly, as I conceive, been regarded as forming a *part of the contract* under which the grantee obtained the land from the state. The late chief justice, in delivering his opinion in Finney *v.* The Commissioners of Mercer county, says, " it is to be considered as a *contract* between the government and the army, and the words being spoken by the legislature, are entitled to a liberal construction in favour of the soldier. But there needs no liberality of construction. The plaintiff asks no other than the literal and common meaning of the expressions of the law."

The act of assembly, passed on the 3d of April 1804, under which unseated lands are made taxable, and the mode of selling them pointed out in case the taxes are not paid, in the second section thereof, *Stroud's Purd. Dig.* 948, declares that, " all unseated lands within the commonwealth, held by individuals, companies, or bodies corporate, either by improvement, warrant, patent or otherwise, shall, for the purpose of raising county rates and levies, be valued and *assessed* in the same manner as other property." But unless this be considered a repeal of the *exemption* previously

[Coney v. Owen.]

annexed to the land of soldiers as a part of the grant, which the legislature, admitting they had the power to do so, a power, however, that may be very questionable, if not denied altogether, certainly did not intend to do, and have not done here, the land in dispute cannot be considered as having ever been taxable at any time before the sale made of it for taxes. Indeed, it is admitted, that the lands of soldiers, granted to them by the state, as a reward for their military services, must be regarded as *excepted* from the operation of that part of the act last recited, by force of the prior acts. I, however, do not consider it barely in the light of an exception, though I cannot perceive, that the result would be materially different, if I did. I consider the exemption from all taxation as a privilege annexed to, or rather incorporated into the grant of the land. In other words, as forming part of the grant, under which the land was given, and as part of the reward intended for the military services performed in achieving and establishing the freedom and independence of the country, which cannot be revoked or set aside. State of New Jersey v. Wilson, 7 *Cran.* 164; Mr Justice Baldwin's opinion in the Charles River Bridge v. Warren Bridge, *p.* 140. Under this view, I confess, it appears to me, that without a violation of good faith, the land could not have been subjected afterwards, by the government, to taxation, as long as it remained the property of the soldier. This being the state and condition of the land in question, while owned by Carleton, it is perfectly evident, that it could neither be assessed with taxes, nor sold for the nonpayment of them, if assessed. It being then in nowise liable to taxation, nothing more would seem to be requisite, than to read the sections of the acts, directing that the purchasers of unseated lands, at sales made thereof for taxes, shall be entitled to the value of the improvements made thereon by them subsequently to their purchases, if the lands shall be recovered from them in ejectment, in order to show, that the provision of the act in this respect, cannot possibly, by any fair or even equitable construction, be made to extend to the land here. The second section of the first act, that is, of the 3d of April 1804, after declaring, that all unseated lands shall be assessed in the terms already stated, proceeds to provide and direct the manner in which they shall be sold, in case of neglect on the part of the owners to pay the taxes assessed. Then comes the third section, which, after declaring what shall be deemed sufficient evidence of the notice, required to be given of the sales thereby directed to be made, and providing for the preservation and protection of the evidence, in case of any trial thereafter, either at law or in equity, respecting the validity of sales made by virtue of the act, enacts, that " no action for recovery of *said lands* (the word ' *said*' here, referring to lands previously made taxable, assessed and sold under the act) shall lie, unless the same be brought within five years after the sale thereof *for taxes as aforesaid:* provided always, that where the

[Coney v. Owen.]

owner or owners of *such lands sold as aforesaid,* shall at the time of such sale be a minor or minors, or insane, and residing within the United States, five years, after such disability is removed, shall be allowed such person or persons, their heirs or legal representatives, to bring their suit or action for recovery of the *lands so sold;* but where the recovery is effected in *such cases,* the value of the improvements, made on the *lands so sold,* after the sale thereof, shall be ascertained by the jury trying the action for recovery, and paid by the person or persons recovering the same, before he, she, or they shall obtain possession of the lands so recovered." Now it does appear to me, too plain to admit of a moment's doubt, that the expressions, " *lands sold as aforesaid,*" " *lands so sold,*" and " *lands so recovered,*" which are used throughout the section, mean identically the *same* lands, and embrace merely the unseated lands made *taxable* by the second section of the act as recited above, and no other whatever; and especially, not lands entirely exempted from all taxation; consequently, the limitation of five years against the former owners, and the provision in favour of purchasers for being paid the value of their improvements, in case the lands should be recovered from them, are alike applicable to the *same* lands; so that the purchaser cannot claim to be paid for his improvements made upon the land, unless the limitation of five years would have been a protection to him, in the event of his having been permitted to remain in the possession thereof, for that length of time, without any suit having been brought for the recovery of it. But it certainly will not be said, that it was the intention of the legislature, to deprive soldiers of their rights to the lands granted them by the state, as a reward for their services, by a limitation of five years in any case, instead of the ordinary limitation of twenty-one years adverse possession. If, however, it be held, that a soldier is bound to pay for the improvements made by the purchaser of his land, at a sale made thereof for taxes assessed upon it, without authority, and against all law, then it inevitably follows, that five years adverse possession of the land by such purchaser, without any suit being brought against him, would be a complete bar to any action instituted thereafter.

It is said, however, that the late chief justice, in delivering the opinion of the court, in Creigh *v.* Wilson, 1 *Serg. & Rawle* 41–2, has declared the words, " *where the recovery is effected,*" must be considered as having a reference to *all* cases of land sold for taxes. But it would be dealing very unfairly with that learned and distinguished judge, to suppose that he meant to include the case of a soldier's land being assessed and sold for taxes. The question raised there, was, whether the clause respecting improvements applied as well to the lands of owners under no disability as to those under the disabilities therein mentioned. The counsel of the plaintiffs in that case, contended that the clause extended only to the lands of minors and insane persons residing within the United

[Coney v. Owen.]

States, and not to the lands of persons of full age and sound mind. The chief justice, then, after endeavouring to show that this distinction was inconsistent with the great object of the provision, proceeds, by saying, " Indeed it would be most extraordinary, if the allowance were restricted to *such* cases, (meaning the cases of minors or insane persons) because, supposing that it is an injury to the owners of the land, (which is assumed, and ·truly assumed, in the argument of the plaintiffs,) it would follow that the proviso places minors and insane persons in a worse situation than others, although, it was intended for their benefit;" and then concludes, " There is no way of avoiding this absurdity, but by giving the words '*where the recovery is effected*,' a general reference to *all* cases of land sold for taxes." Thus, plainly showing that he only intended all cases of unseated lands *liable to taxation* and sold for taxes; for it could not well then have entered into his mind to conceive, that lands, completely exempt from all taxation, would ever be sold for taxes, as long as they remained exempt.

If, however, the least shadow of doubt could be raised, in respect to a soldier's land not being embraced in the clause relative to improvements, a reference to a supplementary and subsequent act of the 13th of March 1815, *Purd. Dig.* 953, (by Stroud,) would at once remove it; and make it as clear as the sun at noon-day, that consistently with the plain, common, and also literal meaning of its provisions, taken together with those of the prior acts, cited above, a soldier, whose land, such as that in question, is taxed and sold on account thereof, cannot be deprived or kept out of the possession of it, until he shall have paid the purchaser at such sale, the value of the improvements made thereon by him after his purchase. The fourth section of this last act, enacts that, " *if the owner or* owners of *lands sold as aforesaid*, (thus referring to the lands before mentioned, which are made expressly liable to taxation,) shall make or cause to be made, within two years after such sale, an offer or legal tender of the amount of the taxes, for which the *said* lands were sold, and the costs, together with the additional sum of *25 per cent.* on the same, to the county treasurer, who is hereby authorized and required to receive and receipt for the same, and to pay it over to the said purchaser, upon demand, and if it shall be refused by the said treasurer, or in case the owner or owners of lands so sold, shall have paid the taxes due on them, previously to the sale, then, and *in either of these cases*, said owner or owners shall be entitled to *recover* the same by due course of law, but in *no other case* and on no other plea, shall an *action be sustained*." Then, after repealing so much of the principal act, as required notice of the taxes being due, and the sale to be made therefor, to be given in certain public newspapers, a proviso is added in the following words: " That when the owner or owners of land sold as aforesaid, shall, at the time of such sale, be an orphan or orphans, or insane, and residing within the United States, two years

[Coney v. Owen.]

after such disability is removed, shall be allowed such person or persons, their heirs, or legal representatives, to bring their suit or action for the recovery of the *lands so sold,* but where the recovery is effected in *such cases,* (meaning, most clearly, the *two* cases before mentioned; First, where the taxes, &c., have been tendered or paid to the county treasurer, within the time limited, *after* the sale; or secondly, where the taxes assessed, have been paid *before* the sale,) the value of the improvements made on the lands so sold, after the sale thereof, shall be ascertained by the jury trying the action for recovery, and paid by the person or persons recovering the same, before he, she, or they shall obtain possession of the lands so recovered." Here, agreeably to the enacting part of this section, it is perfectly manifest, that there are only *two* cases in which unseated lands, sold for taxes can be recovered back by the owner from the purchaser. First, where the amount of the tax, &c., has been tendered or paid, by the owner, within the limited time after the sale to the county treasurer; and, secondly, where the owner has paid the taxes before the sale. In this, there can be no mistake or misapprehension, for it is impossible that this restriction could have been couched or expressed in more explicit or less ambiguous language. After designating the two cases, it is first declared, positively, that the owners of lands in *such* cases, shall be entitled to recover them; but the legislature not content, as it would seem, with this positive enactment, and in order to prevent, not only all misapprehension of their meaning, but likewise to guard against any possible doubt arising, as to what their meaning really was, have superadded the negative words, " but in *no other case* and on *no other plea,* shall an action be sustained;" thus expressly prohibiting the maintenance of an action in any other case, by the owner of the land for the recovery of it, than in the *two* particularly specified. Hence it would follow, most conclusively, that if a soldier's land, granted to him, as a reward for his military services, which happens to be taxed and sold therefor, while unseated, is to be considered as embraced in the expressions made use of throughout the section, " *lands sold as aforesaid,*" " *lands so sold,*" and " *lands so recovered,*" he will be bound to pay the taxes so assessed, either *before* the sale, or otherwise, after the sale, by tendering them together with the costs, and 25 per cent. on the amount thereof, to the county treasurer, within the time limited for that purpose, or else his right to the land will be gone forever. It is very obvious, not only according to the rules of grammatical construction, but to the whole scope and tenor of the act, that each of these expressions refers to, and was intended to embrace, identically the same description of lands, and if it be, that they embrace the lands of soldiers, such as that in question here, then it also follows that the plaintiffs in this case have no right whatever, if the act be constitutional, to recover the land upon any terms. But it is admitted that the plaintiffs have a right to recover the land.

VI.—3 F

[Coney v. Owen.]

And why? Because it was not liable at all to taxation, but wholly exempt from it. This is the only possible ground upon which the plaintiffs' right to recover can be made to stand; and, therefore, not embraced within the scope of the acts authorizing the assessment and collection of taxes. This, then, is certainly yielding the only ground upon which it can even be pretended that the defendants have a right to receive the value of their improvements made upon the land since the sale thereof, before they shall be compelled to surrender the possession to the plaintiffs.

The case of Gilmore *v.* Thompson, 3 *Watts* 106, has been relied on to support the claim of the defendants to be paid the value of their improvements. That case, however, was decided expressly upon the ground, that the land was liable to taxation, and that the tax assessed thereon was paid *before* the sale; thus bringing it within one of the *two* cases expressly provided for by the terms of the 4th section of the act of 1815, wherein it is declared that the owner shall recover his land upon paying for the improvements made thereon by the purchaser after the sale. The only plausible objection to the decision there was, that the provision allowing to the purchaser the value of his improvements, was intended only to be applicable where the owner was an orphan or insane, and residing within the United States at the time of the sale; but the plaintiff not being either an orphan or insane, was therefore entitled to recover the possession of his land without paying for the improvements. This objection, however, had been previously overruled in Creigh *v.* Wilson, under the act of 1804; and the act of 1815, as it was conceived by the court, not being materially different in its terms, as to this point, from the act of 1804, it was therefore rather looked upon as settled.

But it is said that the commissioners of the county have a general jurisdiction over all unseated lands for the purpose of taxation, and in case of failure on the part of the owners thereof to pay the taxes when assessed, to cause the lands to be sold therefor; and hence the purchaser is not bound to look further and see whether the land taxed and offered for sale, belongs to a soldier or not, and thus ascertain whether it was liable to taxation or not; and accordingly buy or not buy, as he found it to be one or the other. This argument, however, if it proves any thing, would seem to prove too much; for it would go to establish the sale, and give to the purchaser the land also, as well as the improvements. Upon the same principle the commonwealth might have her lands taxed, sold and taken from her, or be improved out of them. But it cannot be questioned, I apprehend, that a purchaser at such sale is bound to know whether the commonwealth has parted with her title to the land selling or not; and if he be, and it be so, that she has, then it must be taken that he knows to whom, whether to a soldier or not, as a reward for his military services, which can be determined by inspection of the grant, the record of which is open to every one;

[Coney v. Owen.]

and if it be parted with to a soldier as a reward for such service, he is bound to know that it is *not taxable* as long as it is held by the grantee. This is nothing more than what every purchaser at a judicial sale of real estate has to look to and to guard against; otherwise, he may pay his money for nothing: *caveat emptor* is the rule in such cases, so far as not clearly changed by statute.

Again it is said, that the great object of the legislature was to encourage persons to buy unseated lands when offered for sale on account of taxes, and afterwards to go on and improve them; and therefore, with a view to promote this end, the acts are to be liberally expounded, and by this means the case of the defendants will be brought within the spirit and equity of the acts, if not within the letter of them, so as to receive the value of their improvements. No doubt the design of the legislature was such as has been stated; but then it is a great mistake to suppose that the legislature ever intended that any lands should be either taxed, sold or improved at the expense of the owner, by the purchaser, except those which, under the acts of assembly on this subject, are made liable to taxation; and certainly not the lands of soldiers, such as that in question, as has already been clearly shown, and, indeed, not denied.

It has also been advanced as an argument in favour of allowing the claim of the defendants for their improvements, that it is no injury to the plaintiffs to be compelled to pay for them, because they will then have the full benefit of them; and that the defendants will be great losers if they should have to surrender the possession of the land without being paid for their improvements, which, in justice, ought not to be. I have shown already that, upon a fair construction of the acts of assembly, which are perfectly free from ambiguity, it is impossible to bring the land in question, as long as it remained the property of Carleton, within the operation of any part of these acts. In short, that it is not included within the acts authorizing the taxing of unseated lands for any purpose whatever. This being the case, and there never having been any contract, either express or implied between Carleton and the defendants or the plaintiffs and the defendants, whereby any right could accrue to the defendants to demand payment for their improvements, their equity to be paid for them is the same, and no more than that which every intruder or trespasser has who enters upon and improves lands without and against the consent of the owner. Yet in this latter case it must be admitted, I think, that no claim to compensation for doing so can be sustained in this state, either at law or in equity. It is therefore obvious, that the defendants have no right to any compensation for their improvements, which they can enforce, either at law or in equity. Had they exercised the precaution which the law requires of purchasers generally, it could not have happened to them.

Although the improvements may be of some benefit to the owner of the land, who is not obliged to pay for them in order to obtain

[Coney v. Owen.]

the possession of it, yet generally in point of fact, they are any thing but a benefit to him when he is compelled to pay the value set upon them by a jury before he can get possession.   The prejudices and feelings of juries are almost always in favour of the improver in such cases, and therefore they go in their valuation to the utmost extent that the testimony of witnesses, possessed of similar feelings, will warrant.  But even in a legal point of view, it has been thought to be an injury to the owner of *taxable* land, who has been, on account of his own *neglect of duty* to pay the taxes assessed upon it, compelled to pay for the improvements, or otherwise lose his land.    The late Chief Justice Tilghman must have thought so, for in Creigh *v*. Wilson, 1 *Serg. & Rawle* 41, he says, "supposing it to be an *injury to the owner* of the land, which is assumed, and *truly* assumed in the argument of the plaintiffs."    But if it be an injury to the owner of land, who, on account of his *own default*, is required to pay for the improvements made thereon, or else give up the land itself with the improvements, what must it be considered in regard to the owner of land who has been guilty of no neglect of duty, and is in no default whatever?    To require such a thing of him would seem to be positive injustice—one of the highest injuries that can be committed against the rights of a citizen, as it regards his property: he does not wish to part with his land on any terms: he did not want it improved: but he is, in effect, required to give up his land to the improver, without even being paid a cent for it, or otherwise pay for improvements made on it that he never bargained for, never solicited, did not wish, and has not, perhaps, the means of paying the price set upon them by others without his consent.

I therefore think the court below erred in admitting the evidence showing the value of the improvements, and in directing the jury to ascertain and report the value of them.    The judgment as to the value of the improvements in favour of the defendants ought to be reversed, and the judgment in favour of the plaintiffs for the recovery of the land to stand.

Judgment affirmed.